**NORTH CAROLINA FOX AND HOUND, INC., Plaintiff,**

v.

**SAUL SUBSIDIARY I LIMITED PARTNERSHIP, Chick–Fil–A, Inc., and Horizon Construction of Georgia, Inc. Defendants.**

No. 1:02CV00806.

United States District Court, M.D. North Carolina.

March 28, 2005.

James R. Theuer, James Gray Robinson, Winston–Salem, NC, for Plaintiff.

Timothy Nerhood, Matthew Hallman Bryant, Winston–Salem, NC, John D. Burns, L. Neal Ellis, Jr., Raleigh, NC, Matthew J. Calvert, Ashley Cummings, Atlanta, GA, for Defendants.

### ORDER AND JUDGMENT

BEATY, District Judge.

On February 16, 2005, the United States Magistrate Judge's Order and Recommendation No. 3 [Document # 61] was filed and notice was served on the parties pursuant to 28 U.S.C. § 636(b). Plaintiff filed timely Objections. The Court has now reviewed the Objections and the portions of the Magistrate Judge's report to which objection was made, and the Court has made a *de novo* determination which is in accord with the Magistrate Judge's report. The Magistrate Judge's Recommendation [Document # 61] is therefore affirmed and adopted.

IT IS THEREFORE ORDERED AND ADJUDGED that Defendant Chick–Fil–A,

Inc.'s Motion to Enforce the Settlement Agreement [Document # 46] is GRANTED, and Defendant Saul Subsidiary I Limited's Motion to Amend its Answer [Document # 56] is DENIED.

### ORDER AND RECOMMENDATION No. 3 OF MAGISTRATE JUDGE ELIASON

ELIASON, United States Magistrate Judge.

This case is now before the Court on defendant Chick–Fil–A Incorporated's motion to enforce an alleged settlement agreement,[1] Chick–Fil–A's motion for oral argument on its motion to enforce, and defendant Saul Subsidiary I's (hereinafter Saul Sub I) motion to amend its answer and assert cross-claims for declaratory relief against Chick–Fil–A. The facts consist of the Court record and affidavits and exhibits submitted by the parties. The facts are not disputed. What is disputed is their significance. In this case, Chick–Fil–A contends that the settlement is contained in the January 13, 2004 motion to continue the pretrial conference signed by all the parties. Saul Sub I disagrees and says it was not a settlement agreement.

### Facts

Plaintiff operates a restaurant in the Thruway Shopping Center in Winston–Salem, North Carolina, controlled by Saul Sub I. According to plaintiff, its lease in the shopping center gives it the right to prevent certain activities that are in or that affect a designated "control area." On February 9, 2001, Chick–Fil–A and Saul Sub I executed a ground lease that allowed Chick–Fil–A to construct and operate a free-standing restaurant on the

grounds of the shopping center. Fox and Hound alleged that the plan for the location of the restaurant placed it in or adjacent to plaintiff's "control area," so that the control area would be affected. Plaintiff believed that this gave it the right to stop the construction. Therefore, in August 2002, it filed suit in state court requesting an injunction to stop the construction and, if that injunction was not entered, seeking damages from Saul Sub I for breach of contract and damages from Chick–Fil–A for tortious interference with contract. Saul Sub I and Chick–Fil–A then removed the case to this Court and filed counterclaims seeking a declaratory judgment stating that the proposed restaurant did not breach plaintiff's rights under the lease. Chick–Fil–A also sought damages from plaintiff for tortious interference with prospective business opportunities.

After several months of litigation, including denial of plaintiff's motion to remand the case to state court, the parties were scheduled to appear before the Court for an initial pretrial conference on July 24, 2003. However, all parties joined in making a motion to postpone the conference for 90 days in order to facilitate the possible settlement of the action.[2] The motion informed the Court that a new site plan had been drawn up for Chick–Fil–A's restaurant that moved it farther from plaintiff's control area, that the Board of Zoning had approved the site plan, and that the extra time was requested to reach a final agreement and secure permits. (July 3, 2003 motion, Docket No. 30) The Court granted the motion and the initial pretrial conference was reset to October 23, 2003.

---

**1.** In its motion, Chick–Fil–A asks for attorney's fees, but has not briefed the issue and it is, therefore, not before the Court.

**2.** By this time, Saul Sub I had given the direction and burden of the litigation over to

Chick–Fil–A. Nevertheless, it signed the motion for a continuance, which specifically acknowledged that Chick–Fil–A was attempting to settle the litigation, inasmuch as it had prepared a new site plan. (Docket No. 30)

Following the granting of the motion, Saul Sub I would not agree to the new site plan because it called for constructing the restaurant over a pre-existing box culvert. Saul Sub I does not explain why it did not inform Chick–Fil–A of this problem at the beginning. As will be seen, Saul Sub I knew that a new site was being considered in the spring of 2003. In any event, Chick–Fil–A returned to the drawing board and produced another site plan. This plan also called for the construction of the restaurant outside plaintiff's control area and avoided the problem with the box culvert. By the time this plan was formulated, the pretrial conference date of October 23, 2003 was approaching. Saul Sub I would not agree with the second new site plan. Issues of disagreement had arisen between Chick–Fil–A and Saul Sub I which may have had their geneses in Saul Sub I's change of mind in allowing the restaurant to be constructed at that site, or at least under the present lease. (*See* Ex. F, Docket No. 51, and Ex. F, Docket No. 56) While Saul Sub I now states that the disagreement arose because it was dissatisfied with the delay in the case and that Chick–Fil–A had not terminated the lease because of the delay (proposed amended answer and cross-claim, Ex. A, docket no. 56), as will be seen, the respon-sibility for the delay mostly lies at the feet of Saul Sub I.

On the surface, the problems between Saul Sub I and Chick–Fil–A allegedly arose out of an event occurring early in the litigation. Because of the cost, delay, and uncertainty occasioned by the litigation, in February of 2003, Saul Sub I and Chick–Fil–A signed a side letter to their earlier lease agreement which governed how the parties would proceed. (Ex. I, ¶ 4 Second Featherston Aff., Docket No. 51) Saul Sub I says that the agreement placed the primary burden of defense on Chick–Fil–A. (Ex. A, Sustersich Aff, Docket No. 50) However, the agreement actually only expresses Chick–Fil–A's intention to defend the litigation in good faith. (Ex. 1, Docket No. 47) The agreement also allowed Chick–Fil–A to terminate the lease if the costs of the litigation were too high, the costs of any revised site plan were too high, or the litigation was not resolved by August of 2003.[3] Saul Sub I had no corresponding rights or burdens.

Saul Sub I now says that in September 2003, it became frustrated and told Chick–Fil–A that it would unilaterally terminate the lease if the litigation did not end shortly. (Netter Aff. ¶ 6) In October 2003, it told Chick–Fil–A it wanted the right to

**3.** It is clear that Chick–Fil–A was authorized to settle based on modification to the site plan or the building. The agreement provided in part:

Tenant acknowledges its intention to defend the Litigation in good faith. Notwithstanding anything contained in the Lease to the contrary, if at any time after the date of this side letter, Tenant should desire to terminate the Lease because of (a) the cost of defending the Litigation exceeds $60,000, (b) preliminary or permanent injunctive relief is granted in favor of Fox & Hound, or (c) the Litigation delays construction or operation of the proposed restaurant for a period of time in excess of one (1) year from August 20, 2002, the date that the Litigation was instituted, or (d) *the costs associated with the modifications to the site and/or building design necessitated in an attempt to reach an agreement with Fox and Hound* exceed $50,000, Tenant may, in its sole discretion, terminate the Lease (the *"Termination"*) by providing written notice to Landlord of such intent to terminate (the *"Termination Notice"*). The Termination shall be effective upon Landlord's receipt of the Termination Notice (the *"Termination Date"*). As of the Termination Date, the Lease shall have no further force or effect, and the parties shall have no further obligations to each other, except as otherwise expressly provided in the Lease. (emphasis added)

(February 6, 2003 Stephen White letter to Merle Sustersich)

terminate the lease within 90 days of October 22, 2003. (Sustersich Aff. Ex. A, Docket No. 50) The apparent basis for this position was Saul Sub I's "understanding" that Chick–Fil–A would "defend the case in good faith, and if the case was not dismissed or settled in a reasonably short time frame, Chick–Fil–A would terminate its lease at the Thruway Shopping Center." (Sustersich Aff. ¶ 4) No basis for this "understanding" appears in the side agreement or in any of the other materials before the Court.

The Court does not credit Saul Sub I's claim that its concerns in September 2003 related to delay alone. Saul Sub I fails to present any evidence that it took any action whatsoever to help expedite the settlement.[4] Moreover, it should be pointed out that if Saul Sub I had informed Chick–Fil–A about the box culvert issue from the beginning, the site plan approval and settlement of the lawsuit may well have occurred by or close to September 2003. By the spring of 2003, Saul Sub I knew that a settlement was being pursued through a modification to the site plan, and by July 2, 2003 it knew the plan had been favorably received and approved by the Board of Zoning. Therefore, Saul Sub I knew of the possibility of a "quick" settlement well before September 2003, the time that it now says was a date by which it expected a settlement. The delay in settlement prior to that time and thereafter came from Saul Sub I.

Chick–Fil–A formulated a second new site plan dated October 17, 2003 solving the box culvert problem. It approached Saul Sub I to secure an agreement for the plan, but such was not forthcoming at that time. This necessitated a further extension of the upcoming initial pretrial conference. Saul Sub I refused to join in the motion unless Chick–Fil–A amended their agreement to give Saul Sub I the "same power to terminate as Chick–Fil–A." (Reply Ex. F) (However, Chick–Fil–A had the right to terminate as a result of its shouldering the cost of the litigation.) Eventually, all parties except Saul Sub I filed a joint motion seeking to have the date of the initial pretrial conference extended for another 90 days to allow negotiations to continue. Saul Sub I never stated its position. It neither joined in nor opposed the motion. That motion was granted by the Court and the initial pretrial conference was moved to January 22, 2004.

Saul Sub I and Chick–Fil–A continued their negotiations into early December of 2003. Eventually, "Saul Sub I did indicate that the revised site plan was acceptable ...." (First Netter Aff. ¶ 8) Plaintiff had also agreed to this site plan. Based on their consensus regarding the site plan, all parties, including Saul Sub I, joined in a third motion to continue the initial pretrial conference.

The third motion to continue was submitted to the Court on January 13, 2004. (*See* Docket No. 35) That motion stated that plaintiff began this lawsuit to contest the location of Chick–Fil–A's proposed restaurant under the original site plan, that the previous continuances had been asked for and received in order to allow the parties to negotiate over and pursue alternative site plans, and that the October

---

4. Saul Sub I claims it had no control over nor gave direction to Chick–Fil–A regarding the conduct of the litigation. (Proposed Amended Answer and Cross–Claim, Ex. A, Docket No. 56) However, it is simply not true that it had no control over the litigation. Nothing in the side agreement takes away control. It is true, however, that it gave no direction or help to Chick–Fil–A, except to impose roadblocks to the settlement. This last fact does not aid Saul Sub I's cause and instead, casts a dark shadow over Saul Sub I's claims that the delay occasioned by the litigation was the impetus for any of its actions or intentions, except as a pretext or vehicle to aid in amending or terminating the lease with Chick–Fil–A.

2003 extension "did, in fact enable Fox and Hound, Saul Sub I and Chick–Fil–A to reach agreement in respect to another alternative site plan (the 'Second Site Plan')(sketch attached as exhibit A)." (Jan. 13, 2004 Joint Motion, ¶ 5) The motion continued, "[t]he Second New Site Plan avoids construction over the box culvert and is acceptable to both Saul Sub I and Fox & Hound." (*Id.*) The motion noted that time was now needed to allow Chick–Fil–A to seek a zoning variance, finalize construction plans, and seek the necessary building permits. (*Id.,* ¶ 6) Therefore, the parties requested an additional 120–day continuance of the initial pretrial conference. Paragraphs 6 and 7 of the motion make clear that agreement on a site plan had been reached and that when zoning approval and permits were obtained, a stipulation of dismissal would be filed. They read as follows:

6. Although the parties are in agreement as to the Second New Site Plan, consent to a variance must now be obtained from the Winston–Salem Board of Zoning before the project can proceed. If the Winston–Salem Board of Zoning approves the Second New Site Plan, Chick–fil–A will finalize its construction plans and seek necessary building permits from the City of Winston–Salem.

7. To afford Chick–fil–A additional time to secure the consent and approval of the necessary local governmental entities, the parties request that the Court continue for 120 days the Initial Pretrial Conference and associated deadlines for initial disclosures and the Rule 26(f) conference. If and when all necessary approvals and permits have been secured for the Second New Site Plan the parties anticipate filing a stipulation for the dismissal of this action, thereby avoiding the need to litigate whether the Current Site Plan interferes with Fox & Hound's rights to the "control area."

(Jan. 13, 2004 Joint Motion, pp. 2–3) Based on the parties' representations that the disagreement over the site of Chick–Fil–A's restaurant had ended pending the zoning and permitting process and that dismissal was expected, the Court granted the motion to continue.

Following the third continuance, Chick–Fil–A was able to get its variance, finalize its plans, and submit them to the necessary local officials for approval. Chick–Fil–A also circulated a proposed written settlement agreement that it felt memorialized the parties' agreement and would end the lawsuit. Plaintiff approved this proposed written agreement. However, Chick–Fil–A again experienced problems with Saul Sub I which informed Chick–Fil–A that it was under new management, that it did not wish to proceed with the Chick–Fil–A project because it had identified other, more lucrative, opportunities and, because of the delay, it would attempt to terminate the lease or negotiate a substantially greater rent. (Featherston Aff. ¶ 11, Docket no. 47) Chick–Fil–A responded with a letter reminding Saul Sub I that there was a lease in effect and urging Saul Sub I to honor that lease. (*Id.,* ¶ 12) Chick–Fil–A states that Saul Sub I never responded directly to the letter.

Saul Sub I did not sign the written settlement agreement and refused to join in a fourth motion to continue the initial pretrial conference. That motion was submitted by the other parties and granted in order to allow Chick–Fil–A time to receive the approval on its building plans. Saul Sub I not only refused to join the motion, but filed a separate motion to continue, stating that its agreement in seeking the continuance was only to allow more time for the resolution of the "issues and claims asserted by Plaintiff and Defendants in this action." (Saul Sub I's May 14, 2004 motion to continue, ¶ 1, Docket No. 41) It

stated that the motion for a fourth continuance was not to be taken as representing that an agreement had been reached as to "any other disputes, issues or negotiations between co-defendants and Saul Sub I . . . ." (*Id.*)

The Court did allow a final further continuance and set the initial pretrial conference for June 17, 2004. Prior to that date, and in May 2004, Chick–Fil–A received final approval of its plans from the local officials. (Featherston Aff. ¶ 13) All that remained was for it to pay necessary fees and receive its building permits. (June 17, 2004 Hearing Tr. at 8) Still, Saul Sub I and Chick–Fil–A did not reach any further agreements regarding going forward with their lease and the written settlement agreement was never signed. Therefore, the attorneys for the parties appeared before the Court for their initial pretrial conference.

At the initial pretrial conference, Chick–Fil–A's counsel summarized the facts set out above and stated that Chick–Fil–A felt that in January the parties had all agreed to allow Chick–Fil–A to seek the variance and approvals that it needed, get its permits, have the lawsuit dismissed, and begin building. He related that Chick–Fil–A had gone through essentially all of the steps required of it under the agreement and that it and plaintiff were ready to resolve the case. However, Saul Sub I was now refusing to dismiss the suit and, if necessary, Chick–Fil–A was prepared to file a motion to enforce the settlement. (*Id.* at 7–9) Saul Sub I's attorney agreed with Chick–Fil–A that there had been an agreement on the latest revised site plan, but stated that Saul Sub I wished to get a "global settlement to any issues that this lawsuit may have raised inside the body of the lawsuit" and also to have discussions regarding amendments to the lease to reflect the changed position of the restaurant. (*Id.* at 10) When pressed by the Court, counsel was unable to specifically identify those issues. Accordingly, the Court set the case for a Status Conference in July of 2004 and directed that Saul Sub I send a corporate representative to answer any questions.

The Status Conference was held on July 15, 2004. Just prior to that hearing, Chick–Fil–A did file a motion to enforce the settlement agreement that it believed had been reached. At that conference, a representative from Saul Sub I appeared. Speaking through the attorney, Christopher Netter admitted the case could be dismissed for being moot because the lawsuit was only about whether the original proposed plan violated plaintiff's lease. He further agreed that this issue was solved by the second new site plan and that if a restaurant would be built in that area, it would be built on the second plan site. It was acknowledged that a dismissal of the suit would bar any claims Saul Sub I would have against plaintiff, if for no other reason than by virtue of Fed.R.Civ.P. 13 or 15. He stated that Saul Sub I would not sign the settlement agreement because it needed additional negotiations regarding lease terms, such as termination rights, compensation for the delay, and escalation rights. Saul Sub I has an interest in moving the Chick–Fil–A restaurant or renegotiating the lease for the present site. Further, Chick–Fil–A stated that Saul Sub I was told during the spring of 2003 that it knew Chick–Fil–A was attempting to resolve the lawsuit by going to the zoning board with a new site plan. Chick–Fil–A continued that Saul Sub I encouraged this. Saul Sub I made no objection to Chick–Fil–A's statement. Saul Sub I's position is that it has not agreed to a global settlement of all issues, but does agree that plaintiff's lawsuit is moot because of the second new site plan.

At the end of the conference, Saul Sub I was told to decide whether to proceed with the dismissal of the lawsuit or contest Chick–Fil–A's motion to enforce the settlement agreement. Saul Sub I eventually chose to contest the motion and the motion is now before the Court for a decision. In addition, Chick–Fil–A has filed a motion requesting oral argument on its motion to enforce and Saul Sub I has filed a motion to amend its answer to assert cross-claims against Chick–Fil–A seeking a declaratory judgment clarifying its right (or possibly lack thereof) to terminate its lease with Chick–Fil–A. That motion too is now ready for a decision.

### Discussion

Federal courts have the inherent power to summarily enforce settlement agreements made between the parties involved in litigation before them. *Young v. Federal Deposit Insurance Corp.*, 103 F.3d 1180, 1194 (4th Cir.1997). Jurisdiction arises when the agreement is or was intended to be incorporated in a court order or if there is an independent basis for federal jurisdiction. *Columbus–America Discovery Group v. Atlantic Mutual Insurance Co.*, 203 F.3d 291, 299 (4th Cir.), *cert. denied,* 531 U.S. 918, 121 S.Ct. 277, 148 L.Ed.2d 201 (2000); *Fairfax County-wide Citizens Ass'n v. County of Fairfax, Va.*, 571 F.2d 1299, 1304 (4th Cir.), *cert. denied,* 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978). In the instant case, the settlement agreement purportedly was both used to obtain a court order and was intended to be incorporated into a final order of dismissal. Therefore, the Court has jurisdiction to consider the motion. While the parties cite to both federal and state law, only federal law provides the relevant standard for deciding the motion. *Gamewell Mfg., Inc. v. HVAC Supply, Inc.*, 715 F.2d 112, 116 (4th Cir.1983).

In order to enforce any agreement, the Court must first determine whether or not an agreement exists. This determination is made using standard contract principles. *Hensley v. Alcon Laboratories, Inc.*, 277 F.3d 535, 540 (4th Cir.2002). If there are no material disagreements concerning the settlement agreement and " 'the practical effect is merely to enter a judgment by consent,' " no hearing on the matter is required. *Columbus–America*, 203 F.3d at 298, *quoting, Millner v. Norfolk & Western R. Co.*, 643 F.2d 1005, 1009 (4th Cir.1981). On the other hand, if there are material questions about the existence of an agreement, the authority of an attorney to enter into an agreement, or the agreement's terms, the Court may not summarily enforce the agreement, but must instead hold a plenary hearing to resolve the dispute. *Hensley*, 277 F.3d at 541. While Saul Sub I contends that there is no enforceable settlement agreement, the facts supporting either party's position are not in dispute or ambiguous. The parties only disagree over the meaning of those facts. Therefore, a plenary hearing is not necessary.

Chick–Fil–A contends that the parties' agreement is contained in the January 13, 2004 motion for a continuance. In order to interpret the motion, one must understand its position and importance in this lawsuit. From the beginning, this case has been concerned with only one issue: Whether the proposed location of Chick–Fil–A's restaurant, as described in plaintiff's complaint, violated plaintiff's lease with Saul Sub I. It was the proposed location that sparked plaintiff to file the suit and, in its complaint, plaintiff's primary objective is injunctive relief. It only makes an alternative request for damages in the event that Chick–Fil–A is allowed to build its restaurant in a manner that breaches plaintiff's lease with Saul Sub I. Likewise, Saul Sub I's answer and counterclaim only seeks declaratory relief against plaintiff, and it seeks this relief in

the form of a statement that the plan for the restaurant, as it existed at the time the suit was filed, did not breach its lease with plaintiff. Chick–Fil–A alone seeks damages against plaintiff for tortious interference with contract. However, it does so only in combination with a request for declaratory relief similar to that made by Saul Sub I. Also, the basis for Chick–Fil–A's request for damages and its request for declaratory relief is that the proposed site of its restaurant, as it existed at the time the suit was filed, did not violate plaintiff's lease with Saul Sub I.

■ As to this one issue, it is apparent from the evidence before the Court that the parties did reach an agreement. The parties agreed to the site plan attached to the January 13, 2004 motion to continue the initial pretrial conference. This resolved the issue which precipitated this lawsuit, which was whether Chick–Fil–A could build a restaurant at a location which would not violate plaintiff's lease. In fact, even Saul Sub I agrees that the parties reached an agreement as to the site plan. (Saul Sub I's Brf. at 2—"Saul Sub I agreed in concept to the revised site plan (as did Fox and Hound and Chick–Fil–A), and ultimately joined the Joint Motion.")

Saul Sub I claims that while it did agree to the site plan, any agreement was limited to this and was not "a global settlement of all issues between the parties." (*Id.* at 3) It states that it did not view itself as reaching a settlement of any "other matters in dispute between the parties nor an agreement to enter into any Lease amendments between Saul Sub I and Chick–Fil–A." (*Id.*)

There are at least two significant problems with Saul Sub I's argument. The first problem for Saul Sub I is that an agreement on a site plan resolves the only issue in the litigation. Such a site plan removes the need for plaintiff's requested injunctive relief and its alternative request for damages. It also moots Saul Sub I and Chick–Fil–A's requests for declaratory relief. Chick–Fil–A's request for damages against plaintiff would potentially remain, but this is Chick–Fil–A's counterclaim, not Saul Sub I's, and Chick–Fil–A represents that it agreed to drop the counterclaim once the new site plan was agreed upon. At the time the agreement on the site plan was reached, Saul Sub I had not raised any claim for damages against plaintiff and had not made any cross-claims against Chick–Fil–A regarding lost rent or the validity of its lease. While issues concerning these matters may have been considered by Saul Sub I or even discussed with Chick–Fil–A prior to agreement on the January 13, 2004 motion, they were never actually made a part of the lawsuit or the agreement.[5] The lawsuit was about whether a Chick–Fil–A restaurant could be built at a location which did not impinge on Fox and Hound's control area. (Complaint, ¶¶ 14, 16, and 20) That matter was clearly agreed to by Saul Sub I by virtue of it signing the January 13, 2004 motion. Any agreement that would not allow Chick–Fil–A to build its restaurant would not end the lawsuit.

A second problem for Saul Sub I is that, while referring to other issues between the parties, it never precisely defines the exact issues that it claims remained unsettled.

---

5. It is true that Saul Sub I is now attempting to raise *some* of these issues through a motion to amend its answer to add a cross-claim against Chick–Fil–A apparently seeking a declaration concerning its termination rights, whether Chick–Fil–A continues to have a lease, and whether Saul Sub I has terminated the lease. (Proposed Amended Answer ¶¶ 44, 47, and 48) However, that motion was made well after the alleged settlement agreement was reached. For this reason, the Court will first decide if an agreement was reached. If there was a settlement agreement, the lawsuit is over and the motion is moot.

Inferentially, of course, Saul Sub I now apparently believes that there is an issue between it and Chick–Fil–A about whether a valid lease still exists between them. That, however, was not mentioned in the motion as an item that needed to be addressed before dismissal. Matters raised as an afterthought are neither a part of the settlement agreement nor do they in any way vitiate the agreement. *See Columbus–America*, 203 F.3d at 299.

Next, Saul Sub I argues that the motion to continue could not embody a settlement agreement because the motion was a "procedural" motion. From this, the Court deduces that Saul Sub I is arguing that a procedural motion can never embody a binding agreement on a substantive issue. It cites no case for this proposition and the Court rejects it. The motion did not simply request a continuance, but made assertions of *fact and intentions* and induced Chick–Fil–A to undertake actions in securing approvals and permits, and induced the Court to grant the motion. Such representations are stuff from which a court may enforce the doctrine of estoppel when a party has been induced to take actions by a promise. *See Federal Deposit Ins. Corp. v. Jones*, 846 F.2d 221, 234 (4th Cir.1988), *United States v. Cox*, 964 F.2d 1431, 1434 (4th Cir.1992) (should have known representations would cause actions to be taken); *Fischer v. First Chicago Capital Markets, Inc.*, 195 F.3d 279, 284 (7th Cir.1999)(relying on an oral promise to one's detriment).

In the instant case, it is not clear that it would be appropriate to apply the doctrines of either promissory or equitable estoppel, inasmuch as Chick–Fil–A has an available remedy by the very motion for enforcement of the settlement agreement under consideration. Nevertheless, the representations made by Saul Sub I to both the Court and other parties can and will be interpreted in light of the induced actions taken in reasonable reliance on those representations. As will be seen, in this case, the Court will find certain terms to be implicit because Saul Sub I induced certain actions and understandings by its representations. This, in turn, provides a basis for the Court to determine that the induced actions are "the objectively manifested intentions of the parties," including the party which induced the actions, in this case, Saul Sub I. *See Moore v. Beaufort County, N.C.*, 936 F.2d 159 (4th Cir.1991). The fact that the representations were made in a procedural motion does not change their nature.

■ In its next defense, Saul Sub I points out that in a January 7, 2004 e-mail, Chick–Fil–A stated it prepared the motion for a continuance to "have time to prepare a definitive settlement agreement and to allow Chick–Fil–A to secure the necessary variance ...." (Sustersich Aff., Ex. D, Docket No. 50) Saul Sub I argues that this statement shows that there was no agreement to settle the lawsuit, but that there was only an agreement as to the second new site plan. (Resp. at 6–7) First, it should be pointed out that when an agreement has been reached orally or otherwise, the parties necessarily will have to prepare final papers in order to consummate the agreement, so the action may be dismissed. *Alexander v. Industries of the Blind, Inc.*, 901 F.2d 40 (4th Cir.1990); *Petty v. Timken Corp.*, 849 F.2d 130 (4th Cir.1988)(oral agreement). The fact that final documents needed to be prepared does not show that there was not an agreement.

Second, Saul Sub I's position that the January 13, 2004 motion only contained an agreement as to the site plan is belied by the motion itself which sets out the settlement terms and makes no mention of the "other issues" to which Saul Sub I now alludes. It is true that the motion spoke about preparing final *dismissal* papers for

signature, but did not indicate there was any more work to be done on the *settlement*. Also, the fact that the motion states that the parties anticipate filing a stipulation of dismissal upon future actions does not render the agreement vague and unenforceable because the actions were tied to the definitive acts of securing necessary approvals and permits. These actions, like Saul Sub I's signing the final settlement and dismissal, are ministerial in the context of the litigation or otherwise "comparatively insubstantial" so as not to prevent the enforcement of the settlement agreement. *See Hensley,* 277 F.3d at 540.

Saul Sub I also claims that there was no agreement as to material terms of the settlement agreement. It identifies five items contained in Chick–Fil–A's proposed settlement agreement that were not mentioned as having been agreed to in the January 13, 2004 joint motion to continue. It claims that these new terms prove that the January 13, 2004 motion cannot constitute a settlement agreement because it does not contain all the necessary terms of the agreement.

The "new" terms upon which Saul Sub I relies are five paragraphs of the proposed settlement agreement and release which allegedly contain terms not covered by the January 13, 2004 joint motion. First, as to paragraph 1 of the proposed settlement, Saul Sub I evidently agrees that Chick–Fil–A may "design, locate and construct the Chick–Fil–A project in the manner depicted in the revised site plan attached hereto as Exhibit A," because it does not object to it. However, it objects to the remainder of the paragraph which states that Chick–Fil–A "may make other reasonable and necessary arrangements for the operation of a Chick–Fil–A restaurant at that location." Curiously, Saul Sub I then further states that it objects to paragraph 4, which provides: "Saul and Fox and Hound agree that upon receipt of the per-

mits and approvals, Chick–Fil–A may proceed to construct the Chick–Fil–A project in accordance therewith." From this, it appears that Saul Sub I argues that while it agrees in general that Chick–Fil–A can construct a restaurant on the new site, it does not agree that Chick–Fil–A can *proceed with construction* after receipt of permits and approvals. Nor does it agree that Chick–Fil–A may make reasonable arrangements to operate the restaurant. The distinctions trying to be made are so fine that they simply lose their significance.

Saul Sub I's objections to paragraphs 1 and 4 are both internally inconsistent and inconsistent with the spirit and purpose of the January 13, 2004 joint motion to continue. The whole purpose of the defense of the lawsuit by Saul Sub I and Chick–Fil–A was to get a site plan approved so that Chick–Fil–A could build a restaurant on it. To agree that Chick–Fil–A has a right to construct a restaurant, but then to deny its *actual construction* and operation is not a reasonable reading of the purpose and intent of the agreements in the January 13, 2004 motion. Moreover, Saul Sub I fails to explain why it objects to Chick–Fil–A constructing and making reasonable and necessary accommodations to run the restaurant, except to make vague references to a change of plans for the shopping center. When the record does not contain a basis to support an objection, the Court need not credit it. *Young,* 103 F.3d at 1194.

Saul Sub I's claim that there was no agreement as to whether Chick–Fil–A could construct its restaurant is also flatly inconsistent with the purpose and intent of the statements Saul Sub I actually made in the January 13, 2004 joint motion for an extension of time. In that motion, all of the parties, including Saul Sub I, stated that (1) there was an agreement on the proposed site plan, (2) Chick–Fil–A needed

time to move forward with the permitting and approval process for that site plan, and (3) once that process was completed, the parties anticipated submitting a dismissal of the suit.

Saul Sub I fails to explain why it or any of the parties would have submitted the motion, unless they intended to get zoning approval so that a restaurant could be built. The Court may and does reject Saul Sub I's interpretation of the January 13, 2004 motion because that interpretation would make the motion pointless. *Moore*, 936 F.2d at 163. If no lease existed between Saul Sub I and Chick–Fil–A, there would have been no reason for Chick–Fil–A to expend the money, time, and energy to seek approvals and permits. In other words, paragraphs 1 and 4 allowing for the construction and operation of the restaurant were so material to the entire purpose of the January 13, 2004 motion, that they need not have been spelled out because they were implicit. Saul Sub I made representations which induced actions by the Court and Chick–Fil–A. The Court now uses these actions as a basis for finding that they are objective manifestations of Saul Sub I's intent that the point of the motion was to allow time for Chick–Fil–A to secure approvals so that a restaurant could be built and the lawsuit dismissed. The proposed settlement agreement is merely a necessary mechanical device to carry out the intentions of the parties and paragraphs 1 and 4 are implicit to the parties' agreement.

Saul Sub I also objects to three paragraphs of the proposed settlement agreement that have to do with the lawsuit itself. It points to paragraph 5, which states that the parties agree to request additional extensions of the initial pretrial conference in order to permit Chick–Fil–A to secure the necessary permits and approvals. It further objects to paragraph 6, which states that once the permits and

approvals have been obtained, the parties will file with the Court a stipulation of dismissal dismissing all claims. Finally, Saul Sub I claims that paragraph 8 of the proposed settlement agreement, which provides for all parties to release each other, was not contemplated by the January 13, 2004 motion.

These objections are likewise without merit. In so saying, the Court recognizes that Saul Sub I may well not have intended to request further continuances from the Court, inasmuch as it thought that matters were already much delayed. However, paragraph 5 of the proposed settlement agreement is not a material part of the settlement and may easily be removed without having any consequence to the settlement agreement. At this point, it is simply a moot issue. With respect to paragraph 6, Saul Sub I has provided no basis for disagreeing that all claims would be dismissed once Chick–Fil–A secured the permits and approvals. Saul Sub I only had a declaratory judgment claim, which matter was resolved by the parties' agreement to the second new site plan. Saul Sub I could not possibly object to having claims against it dismissed. Therefore, dismissal of the claims was also implicit.

Last, Saul Sub I objects to a full release of Fox and Hound in paragraph 8. However, and again, Saul Sub I only had a declaratory judgment claim against Fox and Hound, which was resolved by the second new site plan. Therefore, the Court finds that Saul Sub I's claim that other issues remained and were not contemplated by the January 13, 2004 joint motion is without any basis. In addition, if all of the issues listed by Saul Sub I remained, the parties' statement in paragraph 7 of the January 13, 2004 motion that dismissal was anticipated upon completion of the permit and approval process would necessarily have been untrue. That statement specifi-

cally mentions completion of the process as the obstacle to dismissal. Saul Sub I did not list any other obstacles. Both the Court and the parties relied on Saul Sub I's silence. Therefore, it is reasonable to conclude that Saul Sub I agreed to release and dismissal when approvals and permits were obtained.

In conclusion, there would be no basis whatsoever for anticipating dismissal of the case at the end of the permitting process if Saul Sub I can now be allowed to insert reasons for not finalizing the settlement and dismissal, whether because it now contends there is no lease or for some other reason.[6] An agreement on a site plan, existing alone in the absence of an agreement to allow the building and operation of the restaurant and the end of the lawsuit, would have been a meaningless exercise of land-use lawyering. Such a pointless agreement would not have been a reason for the Court or the parties to delay the case further. Saul Sub I agreed to the site plan and to dismiss the case upon completion of the permitting and approval process. It did not mention any other factors then, it may not do so now.

The record clearly shows that Saul Sub I had concerns or questions both before and, somewhat later, after the agreement was reached. However, Saul Sub I put aside its concerns for a time and reached an agreement to settle the case in January of 2004. Had the case not settled, Saul Sub I faced the prospect of having to litigate Fox and Hound's right to control that area of the shopping center. Such litigation may have ended by restricting Saul Sub I's right to use the area for the Chick–Fil–A project and any other project. It had a definite interest in settling the matter. It has secured an important right to use its property from Fox and Hound. It cannot now avoid the effects of the agreement because of second thoughts or because its management now desires to go in a new direction. *Columbus–America*, 203 F.3d at 298 (second thoughts not a reason to avoid a valid agreement). Because all of the material terms of the Proposed Settlement Agreement to which Saul Sub I objects are consistent with and necessary for the implementation of the agreement that Saul Sub I clearly made, the Court should grant Chick–Fil–A's motion to enforce the settlement agreement, should enforce the terms of the Proposed Settlement Agreement presented by Chick–Fil–A, and may do so without a plenary hearing on the matter.[7]

■ Enforcement of the Proposed Settlement Agreement leads to the conclusion that Saul Sub I's motion to amend its answer to raise a counterclaim against Chick–Fil–A should be denied. The counterclaim against Chick–Fil–A seeks a declaratory judgment setting out the rights and obligations of the parties under their current lease, specifically whether Saul Sub I has termination rights under the lease and whether Chick–Fil–A continues to have a valid lease with Saul Sub I. Saul Sub I's attempt to raise these issues more than two years after this lawsuit was filed, and almost a year after settling the only true issue in the case, is far too late to be allowed and the motion will be denied.

6. Saul Sub I did not deny there was a valid lease in its answer. Nor does Saul Sub I provide any understandable basis for saying that Chick–Fil–A breached the lease, including the February 2003 side agreement. As best the Court can understand, Saul Sub I's complaint is that it negotiated what it *now* views as an unfavorable lease amendment with Chick–Fil–A and that events did not transpire as quickly as it expected, and *now* it has new plans for the shopping center.

7. Because oral argument is not necessary in order for the Court to reach a decision on Chick–Fil–A's motion to enforce, its separate motion for oral argument on that motion will be denied for being moot.

**IT IS THEREFORE ORDERED** that Chick–Fil–A's motion to hold an oral argument on its motion to enforce settlement (docket no. 52) be, and the same hereby is, denied for being moot.

**IT IS FURTHER ORDERED** that Saul Sub I's motion to amend its answer (docket no. 56) be, and the same hereby is, denied.

**IT IS RECOMMENDED** that Chick–Fil–A's motion to enforce the settlement agreement (docket no. 46) be granted, and that defendant Saul Sub I be ordered to sign the Proposed Settlement Agreement attached as exhibit A–2 to Chick–Fil–A's memorandum in support of its motion to enforce.